Either we were in court because the statute of limitations had not expired and the case was remanded to the trial court or the district court to ferret out what claims, whether pre-suit conduct gave rise to a separate independent cause of action, whether the pre-suit conduct was a claim in and of itself for bad faith, or whether those pre-suit negotiations between the insurer and the plaintiff's counsel just simply were irrelevant. So in our view, even if the court decides that the claims for pre-suit conduct are not a cause of action in and of itself, what the insurer knew when the plaintiff filed suit in the underlying case is still relevant to evaluating whether the insurer fulfilled its fiduciary duty to the insured. So having said that, the arguments, what the district court did is he pretty much excluded consideration of any communications between the insurer and the plaintiff's counsel in the that information that came between this, in this time period between when the insured, Dr. Dodge reported the claim and the time that the plaintiff's counsel filed the lawsuit are pretty important. In April of 23, I'm sorry, on April 23rd of 2013, Prime begins communicating with the insured. They begin communicating with the attorney for the decedent's family. On that day, the decedent's, the plaintiff's attorney provided the adjuster with the medical records, which included a police report, which kind of outlined horrific events that ultimately resulted in the death of April Jenkins. Between April 23rd and the date that the plaintiff filed the lawsuit, which was in August, I believe it was August 22nd of 2013, there were, the prime adjuster spoke with the insured seven times. They were exchanging information, you know, I believe Dr. Dodge was, you know, telling the insured, the insurer what happened, or, you know, giving her side of the story. They communicated about what Dr. Dodge believed may or may not have been a contributing cause to the death. So you have seven times where the adjuster is getting information from the insured that the adjuster is using in evaluating the claim. And there are also three separate communications between the adjuster and the counsel for the plaintiff in the underlying case. So it's, there's no doubt that Prime was taking an active role in evaluating this case before the plaintiff filed the lawsuit. The plaintiff did make a pre-suit demand for limits, and what the plaintiff asked for is, we believe you should tender the limits of your policy in exchange for a limited liability. I didn't mean to talk over you. That's all right. Why don't you, why don't you finish your thought and then I'll ask the question. Sure, I was saying that what the plaintiff had demanded was a limited liability release, which would preserve, which would allow the plaintiff to accept the proceeds of the insurance policy, but still proceed against the insureds to the extent there were other policies of insurance available. Okay, and that's what I want to ask you about. So my understanding of Mr. Savage's email, as he says to Mr. McBride, you know, I think you, in good faith, in, within two weeks, should make an offer, should tender your liability limit in exchange for a limited release. So if Mr. McBride had said, okay, I will offer you, or I accept, I will give you $50,000, and would there have been an enforceable contract to settle? And part of that question would be, I think there's two tenants, two principles there. One is, is Mr. Savage's email an actual offer under Utah law? And secondly, is the term limited release, did Mr. Savage communicate in his request for an offer his willingness to accept a demand for a limited release? And what would the limited release have entailed? In our view, that would have been an enforceable demand or settlement offer, however you want to describe it, for the limits of the insurance policy was, at that point, to be honest with you, they believed that limits were $100,000. Well, so, so, so let me, I don't mean to keep interrupting you.  But, so could there have been an enforceable contract if Mr. Savage, this is a classic, I think, law school exam, there's not a meeting of the minds when Mr. Savage is saying $100,000 and Mr. McBride thinks it's $50,000. If he had accepted, how could there have been an enforceable contract if they both had different, unexpressed definitions of what the liability limit was? I see what you're saying. And I think at that point, just from experience, the way these communications go forward, you know, they would, Prime would tender what they believed their limits were, which was $50,000. And we would, a limited liability release is kind of a term of art, I guess, for lack of a better term, where it just, what it does is it gives your insurer a huge benefit in that their personal assets are protected. And you can, if there's other insurance, you can still pursue those claims, but their personal assets are protected. And that's a big value. So I think it would have been incumbent on Prime to, to ferret that out. Like we, we have initiated and we've said we are willing to take the limits and then it becomes Prime's issue to, to respond and say, okay, we believe the limits are whatever we think they are. And you go from there. And I think an important part of these eroding, this policy was a burning limits or an eroding limits policy. And from Prime's perspective, their liability under this policy was capped at $50,000, whether they paid that in settlement or whether they paid that in defense costs. So they knew their exposure was $50,000 at that point. And so at that point, I would think their duty is to use that $50,000 to buy the most and best benefit for their, for their insured, which is in this case, paying, tendering the limits in exchange for a release that helps the insured down the road. Well, why in August did Mr. Savage reject the $50,000 tender? In August of, I'm sorry, you're talking about after the suit was filed. Right. So in August, 2013, they tender the $50,000. And as I understand your briefing is that, well, Mr. Savage rejected that not because it was an unreasonable offer, but he knew, or at least he thought unbeknownst to Mr. McBride, that there was a potential claim against the nurse, the attending nurse. And so he, you're saying, well, Mr. Savage was justified in rejecting that offer. But if what you're saying is right, then why, how could there be an inference of bad faith if in, in April of 2013, Savage says, offer the liability limit. You're acknowledging today that it is a $50,000 liability limit. He offers that in August of 2013. And this man, who you say would have accepted that offer, actually rejected exactly the same offer that you're saying would have been accepted 56 months earlier. I think the timing makes a difference because by that point we had had, I'm sorry, the plaintiff's attorney had had to file a lawsuit. And the release, the response from the insurance company from Prime was that we'll get a full release. And Mr. Savage believed that a full release would impair his ability to go against other tort feasters. And so at that point he was not willing to accept that. Did he, but he, is it, but you haven't argued that he communicated that, right? Right. But I would, you know, that's it's a two-way street. The insurance company is the one with the fiduciary duty to their insured. Can I ask you one last question and I promise to shut up after that. So I've asked you too many questions, but if hypothetically, and I know you don't agree with this premise, is that Mr. Jenkins, Mr. Savage, anyone on behalf of Dr. Dodd, CLJ, Jenkins never communicated an offer or a definitive willingness to accept $50,000 to settle in the entirety of the claim. Do either one of your bad faith theories, can you prevail under either one of your bad faith theories? From my reading of the briefs, my understanding is that the premise of both theories is that Prime didn't offer $50,000 early enough. And if they had done that, they would have, McBride would have, or Savage would have accepted it. If he never communicated that he would have accepted $50,000, can you prevail? Yeah, I believe we can because I think we agree that once suits filed, the duty of the insurance company or the adjuster is a fiduciary duty. And so that duty, again, when you've got such small amount of money that you're willing, that you can work with, we think that the fiduciary duty dictates that you be more proactive in trying to get the case resolved. Don't just sit back on your heels, be active with the plaintiff's attorney. And I'd like to reserve two minutes for rebuttal if I could, but the approach taken by the Prime adjuster looks like a check the box approach. And we think it requires more. Dr. Dodds testified continually that she didn't understand really what was going on. And I'd like to reserve my time. Thank you. You may. Let's hear from Mr. Trumbo. Your honors, may it please the court. A couple of reactions to what was just argued today. First, I think they're saying that Judge Shelby ruled that he can't for any reason even consider what was done before the filing of the lawsuit. I don't think that's right. So he did, for example, note that CLJ must have known or had notice of its limits and of the depleting nature of the policy in part because of what happened back in 2008 when they were receiving information. The reason why this doesn't help knowledge about the negotiations prior to the the reason it doesn't help CLJ's argument is because Prime on the day after the lawsuit was filed, once we're looking at, okay, is Prime going to commit some act of bad faith now from day one, they tendered their full limits in part because they know the information that that was just was made that in April of 2013 that Mr. Savage at that point believed that the limits were a hundred thousand. There's nothing in the record to say that he knew what the limits were. He had just a few days prior in a letter asked what are what are the different policies, what are the limits, and it's in response to that April 2013 email that Prime tells him what the limits are. So this idea that he had even in his own mind when he said I think you should tender a figure, I don't think that's accurate. He must have, I mean, presumably been thinking in terms of of millions and not not tens of thousands in in settling a wrongful death case. And so the idea that that he had something in his own mind that could have been accepted, I don't think there's any support for that in the record. Mr. Trumbo, could I ask you a question about this the exchange in April of 2013. Could a reasonable fact finder infer that irrespective of whether this was a definitive offer on Mr. Savage's part, Mr. Brooke McBride was in fact at that pre-suit vantage point representing both Dr. Dodd, CLJ, as well as Prime. And he does get a communication from the claimant's attorney. Why is it in at least a reasonable inference of bad faith that Mr. McBride didn't turn around and call Dr. Dodd and say we might be able to get rid of this thing early. He didn't make a definitive offer, but he said he thinks we ought to make a quick, within two weeks, offer. And Dr. Dodd, why not do that? And she might have had this narrow window, as you know from being an experienced litigator, that many cases do have a particular window where settlement is more conducive than it is later in the litigation before there's a medical examiner's report and the like, a lot of uncertainties that are going to be no longer uncertainties after a while. Why isn't it bad faith not to have communicated to Dr. Dodd about that introductory salvo from Mr. Savage? So I think the response to that email shows how Prime had understood the email, right? So Mr. Savage says, I'm about to talk to the medical examiner, presumably to try confirm his theories of what happened. And he asked for more information about potential nurses or other people involved. So he's, Mr. Savage is doing his investigation. And so Prime responds back, answering everything that, all the information it had at the time and saying, hey, based on what you hear from the medical examiner, please forward to us the report, let us know. And continues the conversation and says, by the way, I'm hearing something from Dr. Dodd's that would be interesting in terms of potential cause of death here, because he was hearing from Dr. Dodd's that there's a bad batch of propofol that got recalled shortly thereafter. And so he's engaging immediately and he doesn't receive any response back from Mr. Savage saying, no, no, no, I don't want to wait for a report. I want you to tender your limits. He doesn't get any indication that there's a disagreement with this approach. And so under these facts, especially when the cause of death is unknown, there are, Dr. Dodd's is saying that she did not commit malpractice and that she wanted to see the report. And especially since ultimately the report says that it's a natural death, I don't think a reasonable jury could infer that at that moment, there was a duty to understand this as an offer and to immediately offer a number that the other side hasn't even indicated they would accept. But discussing 2013 does make me emphasize that the mandate rule is an important aspect of this case. We don't need application of the mandate rule to win this appeal, but it does move the case forward and narrow the focus on things that haven't already been litigated previously. So let me make sure that I understand both of the things you said about the mandate rule, coupled with what you said earlier. So you're not disputing that Ms. Pinckney can rely on really all the information from April until, or February until August of 2013. All you're saying is that she can't predicate a bad faith claim solely on the refusal to make a $50,000 offer within a couple of weeks or soon after Mr. Savage's email in February. Is that correct? Yes-ish. So they haven't presented yet a scenario where they're trying to prove a viable cause of action and the pre-lawsuit discussions are, you know, a relevant fact. So, you know, at trial, if there were a viable cause of action moving forward for post-lawsuit conduct, it's conceivable that they could bring up pre-lawsuit discussions, though it's also very conceivable that the court could rule that out as not sufficiently relevant. Well, I mean, but you're not only making it relevant, you're highlighting it. You know, when the policy was transmitted that there was an explanatory email specifically, you know, telling Dr. Dodds that this is a wasting policy and that the expenses are going to come off of the $50,000. And so that's what I'm trying to get a handle on is, you know, a large part of your argument is the things that happened far before August of 2013, in fact, as early as 2008. And I heard you, I thought I heard you say earlier that you're not, you know, arguing that it, you know, pre-August 2013 information isn't admissible. And that's what I'm trying to get a handle on is what exactly is the takeaway from your argument? That's right. The point I'm making is the specific email with a request to tender, that very well may be completely irrelevant to what gets argued if the case were to move forward. But you're right that I don't think Judge Shelby suggested that there's no fact pre-lawsuit that can be relevant or considered. The point he was making is he was being asked to determine whether there is a viable bad faith claim to move forward, and you have to rely on alleged misconduct that happened after the lawsuit was filed for it, if it's going to be a tort bad faith, which is what got remanded back under the mandate rule. So the answer, the short answer is yes, you're right. That's what our argument is. So are you saying that the pre-August 22 evidence may be admissible as relevant background? It could be, right, that really hasn't come to a head, but it could be potentially admissible as relevant background of, for example, the day of the filing of the lawsuit, what did Prime know about the claim at that time? What did CLJ know about the claim at that time? That's relevant. That's certainly relevant. And so you would have to be talking about, okay, they did receive information about the claim prior to the lawsuit, because that speaks to, at that point in time, what should Prime be doing? Again, the reason that it doesn't help them in this case is because Prime immediately tenders the full limits. So this isn't a case where If there is no evidence pre-August 22 that actually supports the claim of bad faith settlement, then that's the end of the game, according to you, correct? What I'm getting at is what evidence is there that's in the record that occurred before August 22 that would support a claim for bad faith in the process of settlement? Yeah, so the only thing that the other side has pointed to is this email in April of 2013 of, you should tender your limits for a limited release. What limited release means, they don't explain. Even in the briefing in this case, they didn't explain or they don't explain what limited release means or how that could be viewed as a understood term of art. They haven't supported that with any authority. If that email comes into evidence, notwithstanding your argument, if we deem that it's appropriate that it did come into evidence, then is there a genuine issue of material fact? There's not. We do address for both duty, a breach and causation, we address why that email is insufficient to have a viable cause of action. But again, I emphasize that this court's first decision in this case precludes that email from being the basis for a finding of that there was a wrongful act and an act of bad faith. Because this court remanded only a tort bad faith and it explained in its decision that it was applying black. It applied black. It explained that under Utah law, anything before the lawsuit is contract, anything after the lawsuit is tort. And then the court said, held CLJ to its briefing and said, CLJ is only asserting a bad faith on this appeal based on in tort. And it said, therefore, we're only going to consider this under a tort theory. That in and of itself, if you put two and two together, that means that this court was only considering for remand under black, a theory of things that happened after the lawsuit was filed, acts of quote unquote bad faith after the lawsuit was filed. But, you know, as icing on the cake, the court then proceeded to list the theories of liability that CLJ was relying on on appeal and conspicuously missing from that list is the only theory of liability that predates the filing of the lawsuit, which was this alleged missed opportunity in April of 2013, based on this request for a tender. On that theory, if your theory is appropriate, then there still leaves the proposition that there's wiggle room under that specific phrase. I think it's an apposition in black, correct? Okay, so you're referring, I believe, to the without more language in black. Yes, yes. I do want to make crystal clear what that means, because the reply from CLJ actually points out that that language is borrowed from Beck, the prior decision. And in fact, a lot of the key analysis in black is responding to the language in Beck and trying to explain why black is consistent with Beck. Beck has a footnote explaining what it meant by without more. And it says that, look, even though you're going to be filing your bad faith claim as a contract claim under Beck, it doesn't mean that you don't have, you can't have other tort claims that are independent from your bad faith claim. And they list, for example, if the insurer, excuse me, can I finish my thought, my time? Yeah, please complete your response to Judge Murphy's question. So the, if the insurer's conduct is both bad faith and fraud, then you could have an independent cause of action for fraud, and there's nothing in Beck or black that prevents that. Or if it's also an intentional affliction of emotional distress, or if it's also a violation of the statute, those are the three examples that gives, then you can have additional causes of action in tort in addition to your contract claim for bad faith. So that's what the without more meant, and that's not applicable in this case. So you're saying that the three examples, fraud, emotional distress, and I can't remember the other, are the only things that are included in more, in that word more. No, that's not true. There's subsequent cases that have even talked about misrepresentation as an independent tort. The point is that if your conduct is bad faith and you have a claim of bad faith or breach of the implied covenant of good faith, then under black, if it's pre-lawsuit, that has to be a contract claim. But what it's saying is that if the insurer's conduct also breaches some independent duty that's not arising from the contract, nothing in black prevents you from filing that, even if it's a tort claim. So the three examples that were given in Beck were fraud and intentional affliction or a statutory claim, but that's not an exclusive list. It just has to be independent from. The problem here is that they're wanting to disagree with black. They're saying that the claim mishandling, that it should morph into a tort claim, and that's not what the meant by the without morph. All right. Counsel, thank you very much. Thank you. We have some rebuttal time. Amy, would you add two more minutes to Ms. Pigny's rebuttal? You're muted. Ms. Pigny, you're on mute. I apologize, Your Honor. Mr. Trumbo mentioned that at the time in the pre-suit settlement demand in April of 2013, that we didn't know what the limits could be $100,000. I think he's correct in that. I didn't mean to be misleading. We first learned, or the plaintiff's counsel first learned, $100,000 were the potential limit when we made the cotton demand in April of 2014. He was correct in that statement. Ms. Pigny, can I stop and ask you a question? I don't want you to lose your train of thought. From February 2013 to April 2014, I know Dr. Dodds testified, and you've argued that she was confused about the policy limit. Did she ever indicate to prime between those periods, April 2014 and February 2013, that she thought that the policy limit was $100,000? I don't recall her testimony directly on that point. I think she expressed to her insurance counsel, when the cotton demand or the April of 2014 demand was made, she testified about a conversation she had with her insurance defense counsel about what are the limits, what's available, and the insurance defense counsel replied that she didn't know. Okay. But you're not arguing that from February 2013 to April in 2014, that there was bad faith on the part of prime for failing to explain to her what the policy clearly said, and that is that the policy limit per occurrence was $50,000. She was confused, you've certainly argued, but there's no bad faith in that 14-month period for failure to clarify her confusion because they didn't know it, right? Right. I mean, I think, in answer to your question, I think that's a fact question because it's clear she didn't understand what was going on. How would I know? I mean, I might be confused about something in the case, but unless I tell you that I'm confused, how would you know that I'm confused about it? So how would prime have known that she was confused about the policy limit if she never told them? I understand your point. I think that would be a jury question because there's just so much going on about the reasonableness of the communications because at one point, Dr. Dodds testified that she thought that the $50,000 limits was, she had $50,000 available to identify her and an additional $50,000 to defend the claim. Okay. And I think it's important to note that what prime learned pre-suit was that this was horrific allegation of malpractice, that there was a police report associated with it. So it's not like we're just waiting for the ME's report. What they knew was, I won't go through the details, but what they knew through the documents provided by plaintiff's counsel was that this was a horrific incident that resulted in a death. And it might be important to point out that the prime tendered its limits before the ME report ever came out. So they initially in the correspondence, they were discussing, let's wait for the ME report, but they actually tendered the limits before they received that report. Would it have been unreasonable for them to have waited until September when the medical examiner's report had come out? I think that would be a jury question. We would say it would be unreasonable based on the facts that were described in the police report. Let me, I'm paid to take up your rebuttal time, but I do want to ask you a question and I'll be honest with you, it's important to me. So with a complaint that Mr. Jenkins filed in August of 2013, he includes Dr. Grieco's declaration and even Dr. Grieco, who was supporting Mr. Jenkins, says on paragraph nine, although I suspicion that this injury directly contributed to her death, I wish to read the final autopsy report before giving an opinion of the cause of Mr. Jenkins's, Ms. Jenkins's death. And that's exactly what Mr. McBride told Mr. Savage when he received the February, 2013 email that he wanted, depending on what the medical examiner's report shows. And medical examiner's report shows, as Mr. Trumbo said, that it was a natural cause of death based on a pulmonary embolism. And Dr. Dodds testified in her deposition that she had told Prime that she thought that that medical examiner's report exonerated her. And so, you know, the reliance on, you know, Prime's unwillingness to realize this is a slam dunk on liability seems a little far-fetched in light of Mr. Jenkins's own declaration that he attached to his complaint. I wanted to get your take on that. Sure. I think, again, that the facts are horrific. They had put a, the patient woke up during the proceeding, the procedure, and was screaming. And then to make her stop screaming, they put a rag in her mouth. So even if it's not a death case, there's still a personal injury case there. And again, Prime offered its limits without receiving the ME report. So the fact that they're claiming it's so critical is belied by their conduct when they received it. I mean, by tendering their limits before they received it. I believe that my time has concluded, and I thank you. Thank you very much. We appreciate the arguments, counsel. You're both excused, and the court will be in recess until further notice. Thank you. Thank you.